456 S.E.2d 42

**STATE of West Virginia, Plaintiff Below, Appellee,**

v.

**Gerald D. MULLINS, Defendant Below, Appellant.**

**No. 22514.**

Supreme Court of Appeals of West Virginia.

Submitted Jan. 18, 1995.

Decided March 3, 1995.

William C. Forbes, Pros. Atty., Mary Beth Kershner, Asst. Pros. Atty., Charleston, for appellant.

Arthur T. Ciccarello, Ciccarello, Del Giudice and LaFon, Charleston, for appellee.

FOX, Judge: [1]

On 18 March 1994, a Kanawha County, West Virginia, jury convicted the appellant, Gerald D. Mullins, of the crime of principal in the second degree to the first degree murder of James Arnold Pierson. The jury did not recommend mercy, and on 22 April 1994, the

circuit court sentenced the appellant to life in prison without the possibility of parole. He now appeals from the final order entered on 17 June 1994.

On 20 December 1991, at about 7:00 p.m., the appellant and his girlfriend, Karen King, went to the Tap-a-Keg Bar in Charleston, West Virginia. According to a bartender, Karen's father, Charles King, came into the bar sometime between 10:00 p.m. and 10:30 p.m. The victim, James Arnold "Jamie" Pierson, arrived after midnight, accompanied by Gary Prater, Lisa Blackwell, and Barbara Hammond. As soon as Barbara Hammond walked in the door, she and Karen King engaged in a verbal confrontation, and testimony indicated this behavior continued, on and off, right up to the time of the incident which resulted in Jamie Pierson's death. A "pretty good crowd" was present that night, and the principals in this case were drinking alcoholic beverages and shooting pool. The pooltable was quite close to the bar.

Pierson and his friends were about to leave the bar when more angry words were exchanged, and Karen King threw her drink into Pierson's face. According to the evidence, Pierson either grabbed her wrist or hit her, and she then smashed the glass into his head. At this point, the appellant moved from around the pooltable to defend his girlfriend and swung his poolstick at Pierson. His first swing missed, but he hit the bar, shattering glass and breaking the poolstick. The appellant then struck Pierson in the head with the fat end of the poolstick. Pierson fell to the floor. At this same time, the evidence indicates that Karen King's father, Charles King, was also hitting and kicking Pierson and apparently stabbing him three times as well.

The appellant also fell to the floor when Pierson went down, and one witness testified that he saw the appellant stab Pierson in the buttocks with a pocket knife. The medical examiner found the buttocks wound, as well

---

1. Pursuant to an administrative order entered by this Court on 18 November 1994, the Honorable Fred L. Fox, II, Judge of the Sixteenth Judicial Circuit, was assigned to sit as a member of the West Virginia Supreme Court of Appeals commencing 1 January 1995 and continuing through

31 March 1995, because of the physical incapacity of Justice W.T. Brotherton, Jr. On 14 February 1995 a subsequent administrative order extended this assignment until further order of said Court.

as two other nonfatal stab wounds which were consistent with the smaller knife used by the appellant. However, Pierson suffered three more grievous stab wounds that indicated the use of a larger knife. It was this knife, apparently wielded by Charles King, that caused a fatal wound to Pierson's heart. All parties acknowledge that the fatal wounds were inflicted by Charles King. Although King was also indicted for Pierson's murder, he has not yet been brought to trial due to severe health problems.

The appellant assigns the following errors on appeal: (1) the trial court erred in refusing to grant the defendant's motion for a directed verdict of acquittal at the conclusion of the State's case in chief; (2) the evidence was insufficient in this case to prove beyond a reasonable doubt that the principal in the first degree committed the offense of first degree murder; and (3) it is constitutionally impermissible to shift the burden of proof to the defendant in a criminal case.

■ The first two assignments of error question the sufficiency of the evidence upon which the appellant was convicted. This Court has explained the standard for reversing cases based upon an insufficiency of evidence as follows:

 " 'In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done.' Syl. Pt. 1, State v. Starkey, 161 W.Va. 517, 244 S.E.2d 219 (1978)." Syl. Pt. 7, State v. Knotts, 187 W.Va. 795, 421 S.E.2d 917 (1992).

Syllabus point 1, State v. Kirkland, 191 W.Va. 586, 447 S.E.2d 278 (1994). More specifically, in syllabus point 2 of Kirkland, supra, this Court held that:

 "Where a defendant is convicted of a particular substantive offense, the test of the sufficiency of the evidence to support the conviction necessarily involves consideration of the traditional distinctions between parties to offenses. Thus, a person may be convicted of a crime so long as the evidence demonstrates that he acted as an accessory before the fact, as a principal in the second degree, or as a principal in the first degree in the commission of such offense." Syl. Pt. 8, State v. Fortner, 182 W.Va. 345, 387 S.E.2d 812 (1989).

■ West Virginia Code § 61–11–6 (1992) provides, in part, that "[i]n the case of every felony, every principal in the second degree, and every accessory before the fact, shall be punishable as if he were the principal in the first degree...." "A person who is the absolute perpetrator of a crime is a principal in the first degree, and a person who is present, aiding and abetting the fact to be done, is a principal in the second degree." Syl. pt. 5, State v. Fortner, 182 W.Va. 345, 387 S.E.2d 812 (1989).

■ In this case, the appellant argues that there was insufficient evidence to establish that he was a principal in the second degree to murder of the first degree because the State failed to prove a shared intent or association between him and Charles King, the principal in the first degree. The appellant maintains that because there was no evidence of any communications between the two men concerning any type of threat or assault on the victim, and no evidence that Charles King knew that the appellant was acting as his aider and abettor, then there is insufficient evidence to prove that the appellant was acting to aid Charles King in carrying out whatever criminal intent he may have had.

In response, the State points out there was evidence that, during the initial stages of the affray, the defendant said, "I'm going to get my licks in too," and that this indicated knowledge on his part that another person was already attacking Pierson. The State also submits that the fact the appellant knocked Pierson to the floor when he hit him in the head with a poolstick is evidence that the appellant made Charles King's fatal action possible. Finally, the State maintains that the three stab wounds which were ap-

parently inflicted by the appellant are "ample evidence that appellant intended with King to bring about the demise of Jamie Pierson."

We find the State presented sufficient evidence from which the jury could determine that the appellant acted as an aider and abettor and was therefore guilty of being a principal in the second degree to murder of the first degree. The jury received instructions which described the six possible verdicts it could reach in this case: guilty of being a principal in the second degree to murder of the first degree; guilty of being a principal in the second degree to murder of the first degree with a recommendation of mercy; guilty of being a principal in the second degree to murder of the second degree; guilty of being a principal in the second degree to voluntary manslaughter; guilty of being a principal in the second degree to involuntary manslaughter; and not guilty. The elements of being a principal in the second degree to murder of the first degree were explained to the jury as follows:

First, the essential elements of a principal in the second degree to the murder of the first degree are one: That Charles E. King, in Kanawha County, West Virginia, on or about the 21st day of December, 1991 did willfully, maliciously, deliberately, premeditatedly and unlawfully kill James Arnold Pierson. And that the defendant, Gerald Mullins, was present at said time and place, aiding or abetting by acts or words, encouraging, inciting or in some manner offering aid or counsel to the crime, that is, that Charles King commit the murder of the first degree.

Now, ladies and gentlemen, in order for a defendant to be convicted as an aider and abettor and thus a principal in the second degree, the prosecution must demonstrate that the defendant shared a criminal intent of the principal in the first degree. However, the defendant is not required to possess identical intent as the principal in the first degree.

Examining these necessary elements as they apply to the appellant, there is no question that he was not only present during the attack, but he was also an intensely interested participant in the violence that was perpetrated against Pierson. In *State v. Fortner*, 182 W.Va. 345, 387 S.E.2d 812 (1989), this Court explained:

To be convicted as an aider and abettor, the law requires that the accused "in some sort associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." *United States v. Peoni*, 100 F.2d 401, 402 (2d Cir.1938), *quoted with approval* in *Nye & Nissen v. United States*, 336 U.S. 613, 619, 69 S.Ct. 766, 770, 93 L.Ed. 919, 925 (1949), and *State v. Harper*, [179] W.Va. [24], [27], 365 S.E.2d 69, 73 (1987). The State must demonstrate that the defendant "shared the criminal intent of the principal in the first degree." *State v. Harper*, [179] W.Va. at [28], 365 S.E.2d at 74. (Citations omitted). In this regard, the accused is not required to have intended the particular crime committed by the perpetrator, but only to have knowingly intended to assist, encourage, or facilitate the design of the criminal actor. *State v. Harper, supra; State v. West*, 153 W.Va. 325, 168 S.E.2d 716 (1969). The intent requirement is relaxed somewhat where the defendant's physical participation in the criminal undertaking is substantial.

*Id.* 182 W.Va. at 356, 387 S.E.2d at 823 (citations omitted).

A finding that two criminal actors possess a shared criminal intent does not require that an accused aider and abettor intend to commit the crime committed by the principal in the first degree. The intent element is relaxed where there is evidence of substantial physical participation in the crime by the accused. Substantial physical participation by a person charged as an aider and abettor in a criminal undertaking constitutes evidence from which a jury may properly infer an intent to assist the principal criminal actor. Therefore, whether the appellant in this case actually wished to kill Pierson is irrelevant. The fact that the appellant inflicted a considerable trauma to the victim's head with a poolstick and then stabbed the victim three times, albeit nonfatally, is certainly indicative of "substantial physical participation" in the criminal undertaking that resulted in the death of Jamie Pierson.

Next, the appellant argues that there was insufficient evidence to prove beyond a reasonable doubt that the principal in the first degree, Charles King, committed the offense of first degree murder. The appellant maintains no one saw Charles King do anything to Jamie Pierson, other than kick him and strike him with a poolstick, and there was absolutely no evidence that King premeditated or deliberated to kill Jamie Pierson. Therefore, the appellant argues there is insufficient evidence to support a first-degree murder conviction. We disagree.

We find the State presented sufficient evidence to prove beyond a reasonable doubt that Charles King was guilty of first degree murder. First, a significant amount of testimony presented at trial indicated that Charles King was involved in the attack on Pierson. Gary Bean, who did not know Pierson, testified that he told the bar owner, Dennis McKinney, that there was going to be trouble because Charles King had gotten involved in the dispute between his daughter and Barbara "Bobbie" Hammond, and that Charles King kept aggravating "[Pierson] and this Bobbie woman." Bean also told McKinney that he saw a knife sticking out of Charles King's right rear pocket.

Both Bean and James Hanna, a janitor who was sitting in a booth reading when the fight erupted, testified that Charles King was standing at the bar beside his daughter, Karen, when she threw the drink into Pierson's face. Bean's girlfriend, Elizabeth Holcomb, said she saw Charles King go toward Jamie Pierson before the appellant reached him, but she didn't see him do anything, probably because Bean was trying to get her away from the fight.

Charlotte Taylor, who was behind the bar once the fight started, said that, from her vantage point, she could only see Jamie Pierson until he was hit. However, she could still see the appellant and Charles King hitting Pierson with poolsticks. Taylor also said that she heard someone yell, "Tell Dennis to hurry up and get the police and ambulance down here, they're killing him."

Barbara "Bobbie" Hammond said she hadn't seen Karen King before that night.

However, most of the witnesses testified about the manner in which Karen King began screaming obscenities at Hammond as soon as she walked in the door. Hammond was not Jamie Pierson's girlfriend, but she did accompany him to the bar that night. Hammond said Pierson was lying on the floor in the fetal position, and Charles King was kicking him in the head when she jumped him from behind. She said Charles King struck her with his fist, either stunning her or knocking her out.

The testimony of two other witnesses corroborates this portion of Hammond's account. Charlotte Taylor stated that "[a]t one point Charlie King did leave the fight to go over and hit Bobbie, knocked her up against the wall." When asked if he saw Charles King in the middle of the fight, James Hanna said that he "didn't see him until after they fell down behind the pooltable and I seen the top of his head. That's when I realized that he was in—he was involved in the fight too." Hanna then said that Barbara Hammond ". . . grabbed Charlie and pulled him up, and he stood up and hit her right in the mouth just like a man would hit another man. And that really surprised me, because I'm not used to a man hitting a woman with his fist. And then he left, walked out the door."

Although Charles King quickly left the bar, he called at 4:13 a.m. and talked to Dennis McKinney for approximately six or seven minutes. During this time, McKinney tried to find out King's location and keep him on the line for the police. Detective Richard Ingram of the Charleston Police Department was present at the bar at this time, and McKinney signaled to him when King called. Detective Ingram picked up an extension and listened to part of King's conversation with McKinney. According to Detective Ingram, King "was excited and somewhat agitated, indicated that as soon as the fight started, he had left, and that he had seen a lot of blood, and indicated that's why he left." King asked how Pierson was, and Detective Ingram indicated to McKinney that he did not want him to tell him that Pierson was dead. Detective Ingram testified that King "wanted to know about the heat. I took reference to the fact that he probably was talking about

the police again." During cross-examination, Detective Ingram answered in the affirmative when he was asked, "And he was basically trying to pump Dennis McKinney to find out how much the police knew. That was the purpose of the call, wasn't it?"

Detectives Thomas Ransom and James Rollins of the Charleston Police Department recovered Charles King's knife from underneath the front passenger seat of a vehicle in which he was a passenger. According to Detective Ransom, the knife was burned and "in bad shape." Detective Ransom took a statement from Charles King's sister, Betty Jean Hackney, who said King's clothes and knife were burned in her fireplace. Detective Ransom also obtained a statement from Freda Bryant Moore, Charles King's first cousin, who said, "[h]e told me he did kill the guy, stabbed the boy, and that he was going up the river for life and it didn't matter to him." At trial, Freda Bryant Moore testified that she helped Betty Jean Hackney clean the fireplace in which the clothes and knife were burned and that she was told to dump the ashes in the river.

The final defense witness at trial was Carl Gibson, who said that Charles King was married to his first cousin and that he had worked with him on and off for the past ten years. Gibson testified that King awakened him that night, beating on his door at approximately 2:30 or 2:45 a.m. King made phone calls from Gibson's house. According to Gibson, King tried to call his daughter, Karen, but she wasn't home; "[t]hen he called his wife twice, and then he called Dennis at Dennis' Tap-a-Keg." Gibson gave a statement to the police in January, 1992, in which he discussed seeing blood spots on King's shirt and blood on his hands. However, at trial Gibson repeatedly indicated that he didn't remember, although he conceded that his memory of the night was better in January, 1992.

In addition to all of this witness testimony regarding King's activities on the night Jamie Pierson was killed, the appellant's theory throughout the trial was that Charles King did indeed kill Pierson, but without the appellant's assistance or knowledge. For example, in opening statements the appellant's

counsel stated, "Charles King committed the murder in this case, and there's no question about that ... no question but that Charles King was stabbing with a knife that inflicted fatal wounds. And his intent was to do real harm and to kill Mr. Pierson." During closing arguments, the appellant's counsel again stated, "... I don't think there's anybody in this courtroom who doesn't believe right now that Charlie King inflicted the fatal blow...."

While it is true, and truly remarkable, that not a single witness admitted to seeing Charles King stab Jamie Pierson, we find there is overwhelming circumstantial evidence to indicate that this did in fact happen. Moreover, given the stark reality of Jamie Pierson's sudden, senseless, and violent death, one can hardly fault a jury that has repeatedly been told that Charles King inflicted the fatal wounds, for concluding that King was in fact guilty of first-degree murder.

The appellant's final argument on appeal challenges the trial court's jury instructions on the issue of malice, arguing that they were not unlike the instruction condemned in *State v. Jenkins*, 191 W.Va. 87, 443 S.E.2d 244 (1994). In syllabus point 4 of *Jenkins*, this Court stated that "[a]n instruction in a first degree murder case that informs the jury that malice need not be shown on the part of the defendant against the deceased is erroneous." The appellant argues that because some testimony indicated that the appellant had words with another person in the bar that night, "[t]he State attempted to show that he was exhibiting ill will towards that person other than the decedent. From the confrontation with another individual, the jury could have inferred the malice toward the Defendant." We find no merit in this argument, primarily because the jury was far more likely to have inferred malice from the appellant's physical attack upon Pierson than from a verbal exchange with another bar patron. Moreover, we find no error in the trial court's instructions which defined malice. The trial court explained as follows:

Now, ladies and gentlemen, you're going to hear the word "malice" as I read you

some further instructions, so I want to specifically define malice for you, the term. The word "malice," as used in these instructions, is used in a technical sense. It may either be express or implied, and it includes not only anger, hatred and revenge, but other unjustifiable motives. It may be inferred or implied from you from all of the evidence in this case, if you find such inference is reasonable from the facts and circumstances in this case which have been proven to your satisfaction beyond a reasonable doubt.

It may be inferred from any deliberate and cruel act done by the defendant without any reasonable provocation or excuse, however sudden. Malice is not confined to ill will toward any one or more particular persons, but malice is every evil design in general, and by that is meant that the fact has been attended by such circumstances as are ordinary symptoms of a wicked, depraved and malignant spirit and carry with them the plain indications of a heart, regardless of social duty and fatally bent upon mischief.

It is not necessary that malice must have existed for any particular length of time, and it may first come into existence at the time of the act or at any previous time.

The instruction rejected by the *Jenkins* Court began by stating: "The Court instructs the jury that to convict one of murder, it is not necessary that malice should exist in the heart of the defendant, ... against the deceased." *Jenkins,* 443 S.E.2d at 248, n. 4. The *Jenkins* Court stated that this initial sentence was wrong, and then explained that "[t]he rule that malice must be shown against the victim is consistent with our earlier cases, as illustrated by Syllabus Point 5 of *State v. Panetta,* 85 W.Va. 212, 101 S.E. 360 (1919)":

Malice is an essential element of murder either in the first or second degree, and where an intentional homicide by the use of a deadly weapon is admitted, the jury may infer malice, willfulness and delibera-

tion from the act; and *by legal malice is meant not only such as may exist against the deceased,* but it includes such disposition of the accused as shows a heart regardless of duty and fatally bent on mischief. (Emphasis added.)

*Jenkins,* 443 S.E.2d at 249. This language from *Panetta,* cited with approval in *Jenkins,* is similar to the language contained in the malice instruction given in this case, wherein the trial court explained that:

Malice is not confined to ill will toward any one or more particular persons, but malice is every evil design in general, and by that is meant that the fact has been attended by such circumstances as are ordinary symptoms of a wicked, depraved and malignant spirit and carry with them the plain indications of a heart, regardless of social duty and fatally bent upon mischief.

Consequently, we find no reversible error in the trial court's instructions regarding malice.

For the reasons set forth above, the 17 June 1994 final order of the Circuit Court of Kanawha County, West Virginia, is affirmed.

Affirmed.

BROTHERTON, J., did not participate.

FOX, Judge, sitting by temporary assignment.

CLECKLEY, J., dissents and files a dissenting opinion.

CLECKLEY, Justice, dissenting:

I dissent to Syllabus Point 1 for the same reasons stated in my concurring opinion in *State v. Phalen,* 192 W.Va. 267, 452 S.E.2d 70, 74–75 (1994).