IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

January 2024 Term

**FILED**

**June 5, 2024**

released at 3:00 p.m.
C. CASEY FORBES, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 22-0042

STATE OF WEST VIRGINIA,
Plaintiff Below, Respondent,

v.

BRIAN E. LYON, II,
Defendant Below, Petitioner.

Appeal from the Circuit Court of Marion County
The Honorable Patrick Wilson, Judge
Case No. 20-F-145

AFFIRMED

Submitted: April 17, 2024
Filed: June 5, 2024

M. Tyler Mason, Esq.
Leslie Legal, PLLC
Dellslow, West Virginia
Counsel for Petitioner

Patrick Morrisey, Esq.
Attorney General
Michael R. Williams, Esq.
Principal Deputy Solicitor General
William E. Longwell, Esq.
Assistant Attorney General
Charleston, West Virginia
Counsel for Respondent

JUSTICE WALKER delivered the Opinion of the Court.

SYLLABUS BY THE COURT

1.      "'To trigger application of the "plain error" doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings.' Syl. pt. 7, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995)." Syllabus Point 2, *State v. Davis*, 232 W. Va. 398, 752 S.E.2d 429 (2013).

2.      "An unpreserved error is deemed plain and affects substantial rights only if the reviewing court finds the lower court skewed the fundamental fairness or basic integrity of the proceedings in some major respect. In clear terms, the plain error rule should be exercised only to avoid a miscarriage of justice. The discretionary authority of this Court invoked by lesser errors should be exercised sparingly and should be reserved for the correction of those few errors that seriously affect the fairness, integrity, or public reputation of the judicial proceedings." Syllabus Point 7, *State v. LaRock*, 196 W. Va. 294, 470 S.E.2d 613 (1996).

3.      "Although this Court may, under Rule 30 of the West Virginia Rules of Criminal Procedure, notice plain error in the giving of an erroneous instruction (in the absence of a proper and timely objection at trial), this Court will not ordinarily recognize plain error under such circumstances, even of constitutional magnitude, where the giving of the erroneous instruction did not substantially impair the truth-finding function of the trial." Syllabus Point 2, *State v. Hutchinson*, 174 W. Va. 688, 342 S.E.2d 138 (1986).

i

4. "Assuming that an error is 'plain,' the inquiry must proceed to its last step and a determination made as to whether it affects the substantial rights of the defendant. To affect substantial rights means the error was prejudicial. It must have affected the outcome of the proceedings in the circuit court, and the defendant rather than the prosecutor bears the burden of persuasion with respect to prejudice." Syllabus Point 9, *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995).

5. "A judgment of conviction will not be set aside because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice." Syllabus Point 5, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995).

6. "Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters." Syllabus Point 6, *State v. Sugg*, 193 W. Va. 388, 456 S.E.2d 469 (1995).

7. "A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the

evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled." Syllabus Point 3, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

.

WALKER, Justice:

In 2021, Petitioner Brian E. Lyon, II, was convicted of eight felonies including first-degree murder, first-degree sexual assault, and attempted first-degree murder. The trial court imposed the maximum penalty for each offense. On appeal, Mr. Lyon argues that unpreserved trial errors affected the fairness of the proceedings. First, he claims that the trial court delivered a defective jury instruction on first-degree sexual assault because it failed to include an element of the crime, lack of consent. But he waived any right to have the jury instructed differently and cannot meet his burden under a plain error analysis to show prejudice because he did not dispute the victim's lack of consent at trial. Mr. Lyon also claims that the assistant prosecuting attorney made improper comments to the jury when he referred to Mr. Lyon as a "monster" and "evil" during his opening statement and closing argument. While we agree that some of these remarks were improper, they did not unfairly mislead the jury or prejudice Mr. Lyon considering the strength of the State's evidence establishing his guilt. Because we find no merit to these and other assignments of error, we affirm the convictions.

## I. FACTUAL AND PROCEDURAL BACKGROUND

At 8:10 a.m. on September 29, 2019, Marion County 911 received a call from an eight-year-old girl who reported that her mother had been shot and was having difficulty breathing. The dispatcher traced the call to 244 Lanham Lane, a residence near Fairmont. When officers arrived at the scene, they found the homeowner, Christopher W. Moses,

1

dead in the garage from apparent gunshot wounds. They located the child who was visibly upset but physically unharmed. They found the girl's mother, D.S.,[1] naked in bed, covered in blood, and struggling to breathe. First responders transported D.S. to the hospital for emergency treatment and she survived. While intubated in the intensive care unit in critical condition from gunshot sounds, D.S. was able to communicate with officers and hospital personnel using a whiteboard. She indicated that the man who attacked her was tall, black, and thin. During a police photograph array, D.S. identified Brian E. Lyon, II, as her assailant.

A police investigation uncovered a large amount of evidence connecting Mr. Lyon to the crimes. Although the murder weapon was never located, seven firearm casings were recovered and forensic experts stated that the victims were shot from the same handgun.[2] A Marion County Grand Jury returned an indictment charging Mr. Lyon with burglary, first-degree murder of Mr. Moses, first-degree sexual assault of D.S., attempted

---

[1] Because this victim was sexually assaulted, we use her initials to protect her identity. *See* W. Va. R. App. P. 40(e).

[2] Using an FBI database search, forensic experts narrowed the murder weapon down to several handguns including a .380 caliber automatic. When searching Mr. Moses's home, officers found a Ruger LCP .380 pistol case that was empty; forensic experts stated that this could have been the weapon that was used to shoot the victims.

2

first-degree murder of D.S., two counts of first-degree robbery, and two counts of use of a firearm in the commission of a felony.[3]

The Circuit Court of Marion County conducted Mr. Lyon's jury trial in September 2021. The State introduced evidence showing that Mr. Lyon's cell phone's geo-location data placed him at Mr. Moses's home on the night of the crimes and showed where he traveled in Mr. Moses's truck after he fled the scene. Mr. Lyon's DNA was found on a beer can recovered from the home, and his seminal fluid and skin cells were found on a piece of paper towel there. D.S. testified at length and detailed her horrific encounter with Mr. Lyon. Mr. Lyon's girlfriend testified about meeting him after he committed the crimes and traveling with him to Pennsylvania where he was eventually apprehended by authorities. We recite the facts the jury heard in the light most favorable to the State,[4] reserving certain details for later discussion.

D.S. and her daughter spent the night at Mr. Moses's home on September 28, 2019. Mr. Moses was in the Glen Elk area of Clarksburg that evening at a friend's unlicensed bar watching a pay-per-view Ultimate Fighting Championship event. D.S. waited up for Mr. Moses to come home for a while but eventually sent him a text message saying that she was going to bed. Mr. Moses replied, saying that he would be home after

---

[3] Mr. Lyon was also indicted on one count of kidnapping, but that charge was dismissed before trial.

[4] *See* Syl. Pt. 3, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

the fight.  D.S. went to the upstairs bedroom and went to sleep while her daughter slept in an adjacent bedroom.

Mr. Lyon was at the same UFC watch party in Clarksburg, and he left with Mr. Moses around 3:30 a.m.  They traveled in Mr. Moses's white Dodge Ram truck and arrived at the residence on Lanham Lane early in the morning hours of September 29th.  D.S. woke up later that morning and walked downstairs to find a person laying on the couch covered with a blanket.  Believing this was Mr. Moses, D.S. placed her hand on this person's shoulder, causing him to remove the blanket from his face, revealing a man whom D.S. had never seen before.  She later identified Mr. Lyon as the man on the couch.

Mr. Lyon told D.S. that Mr. Moses was in the garage.  She went there and found Mr. Moses smoking a cigarette.  Mr. Moses said that he was "really wasted" and that Mr. Lyon "drove me home in my truck."  D.S. returned to bed and fell back asleep.

D.S. was later awakened by Mr. Lyon holding a handgun to her face and demanding that she give him money.  D.S. emptied her purse, which contained two debit cards and about $50 in cash.  Mr. Lyon told her to give him the PINs for the debit cards, threatening that he would kill her if she lied.  Mr. Lyon said that he "need[ed] two grand to get out of town."  After taking the debit cards and cash, Mr. Lyon held her at gunpoint and told her to go downstairs.  Mr. Lyon told D.S., "I killed your boyfriend.  He's dead in the garage, and you're going to walk out into the garage, and you're going to get his wallet

4

out of his back pocket and hand it to me." They walked to the garage, D.S. saw Mr. Moses dead, and she retrieved his wallet. Mr. Lyon opened the wallet and dumped everything onto the garage floor. He told D.S. to show him where the safe in the home was, but she explained that she was unaware of any safe. Mr. Lyon walked her throughout the house looking for a safe and they went down into the basement. Mr. Lyon punched D.S. in the face and told her that she better not try to grab the gun, or he would kill her.

Mr. Lyon made D.S. lie on the basement floor and remove her pajama pants. He threatened to tie her up and duct tape her mouth if she did not comply with his demands. Mr. Lyon sexually assaulted D.S. by engaging in penetrative sexual intercourse. After he was finished, Mr. Lyon told her to go shower and they went back upstairs. D.S. saw that her daughter was in bed screaming and reaching out for her. D.S. begged Mr. Lyon to not hurt her or her daughter. Mr. Lyon allowed D.S. to step toward her daughter to console her, but he kept standing in the doorway with the handgun and would not let her go into the bedroom. D.S. told her daughter to just stay in the room.

Complying with Mr. Lyon's commands, D.S. went into the shower to wash off. Mr. Lyon shot D.S. through the glass shower door. The glass shattered, and the bullet entered D.S.'s back, piercing her left lung. She went down on top of the broken glass. Mr. Lyon shot D.S. again, and that shot went through her face, across the roof of her mouth, through her neck and into her shoulder.

5

Mr. Lyon fled the scene driving Mr. Moses's truck. He traveled north on I-79 and disposed of Mr. Moses's cell phone near the Westover exit around 8:30 a.m. Security footage from a gas station in Westover showed Mr. Lyon exiting the truck; he went into the gas station and used the in-store ATM, at 8:49 and 8:50 a.m., to make two $200 withdrawals from D.S.'s bank account, using her debit card.

Mr. Lyon contacted his girlfriend, Amber Gray, on the morning of September 29th and told her to meet him and bring a container of gasoline and a change of clothes for him. When they met, Mr. Lyon was driving a white truck that Ms. Gray had never seen before. She gave him a change of clothes and a plastic bottle filled with gasoline. They drove to the Avalon Motor Inn in Pennsylvania; Mr. Lyon dropped her off to check in while he parked. When he got to the room, Mr. Lyon immediately threw his clothes in the trash and jumped into the shower. Later that day, a Pennsylvania State Trooper responded to a call that a vehicle was on fire, near the Avalon Motor Inn. By the time the fire department arrived, Mr. Moses's truck was engulfed in flames.[5] When Pennsylvania law enforcement officers apprehended Mr. Lyon on October 1st, he was at the Budget Inn in Belle Vernon, with Ms. Gray.

---

[5] Video surveillance showed Mr. Lyon leaving the area where the truck was found burned.

6

After the State presented its case, Mr. Lyon chose not to testify or call any witnesses in his defense. Through cross-examination of the State's witnesses, defense counsel pointed to Mr. Moses's financial problems and substance abuse issues to suggest that others may have had motive for the crimes. After being instructed by the trial court as to the various offenses and hearing closing arguments of the parties, the jury deliberated and returned guilty verdicts on all eight counts. The jury did not recommended mercy. At sentencing, the trial court imposed the maximum penalty for each offense and ordered each sentence to run consecutively. It entered the sentencing order on December 17, 2021.

## II. STANDARD OF REVIEW

Mr. Lyon argues that unpreserved trial errors affected the fairness of the proceedings. We apply different standards of review to the issues he raises and set them out more particularly below. Because none of the issues he raises were presented to the trial court for resolution, we review them for plain error. Establishing plain error is no easy feat: "'To trigger application of the "plain error" doctrine, there must be (1) an error; (2) that is plain; (3) that affects substantial rights; and (4) seriously affects the fairness, integrity, or public reputation of the judicial proceedings.'"[6]

---

[6] Syl. Pt. 2, *State v. Davis*, 232 W. Va. 398, 752 S.E.2d 429 (2013) (quoting Syl. Pt. 7, *State v. Miller,* 194 W. Va. 3, 459 S.E.2d 114 (1995)).

We recognize that while "[e]ach criminal defendant is entitled to a fair trial[,] . . . there are few, if any, perfect trials. This is inevitable because trials are human endeavors."[7] In *State v. LaRock*, we held that a criminal conviction should be reversed under plain error only when necessary to avoid a miscarriage of justice:

> An unpreserved error is deemed plain and affects substantial rights only if the reviewing court finds the lower court skewed the fundamental fairness or basic integrity of the proceedings in some major respect. In clear terms, the plain error rule should be exercised only to avoid a miscarriage of justice. The discretionary authority of this Court invoked by lesser errors should be exercised sparingly and should be reserved for the correction of those few errors that seriously affect the fairness, integrity, or public reputation of the judicial proceedings.[8]

With these principles in mind, we turn to Mr. Lyon's assignments of error.

### III. ANALYSIS

For the first time on appeal, Mr. Lyon argues that: (1) the trial court delivered a defective jury instruction on first-degree sexual assault because it failed to include an element of the crime, lack of consent; (2) the prosecuting attorney made several inappropriate comments to the jury when he referred to Mr. Lyon as a "monster" and "evil" during opening statements and closing arguments; and (3) there was insufficient evidence

---

[7] *State v. Dunn*, 375 P.3d 332, 336 (Kan. 2016).

[8] Syl. Pt. 7, *State v. LaRock*, 196 W. Va. 294, 470 S.E.2d 613 (1996).

8

of intent to sustain the convictions of premeditated first-degree murder of Mr. Moses, first-degree robbery of Mr. Moses, and burglary.[9]  As explained below, we agree with the State that Mr. Lyon has not met his burden to prove that his rights were substantially affected such that the outcome of the proceedings would have been different.

### A.  Jury Instruction

Mr. Lyon argues that the trial court's jury instruction on first-degree sexual assault was defective because it failed to include lack of consent as an element of the crime. Whether jury instructions are correct is a question of law, which this Court resolves de novo.[10]  The jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the

---

[9] While Mr. Lyon also contends that the trial court committed plain error by failing to instruct the jury on felony murder, this assignment of error merits little discussion.  Mr. Lyon reasons that because the jury could have found him guilty of felony murder (e.g., the murder of Mr. Moses occurred during the commission of a robbery), the trial court was required to instruct on that category of first-degree murder under *State v. Giles*, 183 W. Va. 237, 395 S.E.2d 481 (1990).  But *Giles* is distinguishable because the record revealed "that the prosecution relied heavily upon the felony-murder theory of the case[.]"  *Id.* at 246, 395 S.E.2d at 490.  Contrary to Mr. Lyon's assertion, the record shows that the State never pursued the theory that he committed the first-degree murder of Mr. Moses by felony murder.  Rather, the State pursued the crime as premeditated first-degree murder when it sought the indictment, and it continued to pursue that theory throughout the trial.  And as the State points out, the phrase "felony murder" is not mentioned in the record.

[10] *See LaRock*, 196 W. Va. at 308, 470 S.E.2d at 627 ("The legal propriety or correctness of a jury instruction is a question of law that we review *de novo*.").

9

pleadings and the evidence, there is no prejudicial error necessitating reversal.[11] Failure to object to a jury instruction after it has been submitted by the court to counsel for review precludes raising an objection on appeal absent plain error indicative of a probable miscarriage of justice.[12]

The jury instruction at issue tracked the statutory language of West Virginia Code § 61-8B-3 (2006) and provided that: "Sexual assault in the first degree is committed when a person engages in sexual intercourse or sexual intrusion with another person and, in so doing: (1) inflicts serious bodily injury upon anyone; or (2) employs a deadly weapon in the commission of the act."[13] The court defined "sexual intercourse" and "sexual

---

[11] *See* Syl. Pt. 4, *State v. Surbaugh*, 230 W. Va. 212, 737 S.E.2d 240 (2012) ("'A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not misled by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.'") (quoting Syl. Pt. 4, *State v. Guthrie,* 194 W. Va. 657, 461 S.E.2d 163 (1995)).

[12] W. Va. R. Crim. Pro. 30; *see also Miller*, 194 W. Va. at 17 n.23, 459 S.E.2d at 128 n.23 (stating that, "in West Virginia criminal cases the sole bases for attacking an unobjected to jury charge are plain error and/or ineffective assistance of counsel.").

[13] *See* W. Va. Code § 61-8B-3 ("(a) A person is guilty of sexual assault in the first degree when: (1) The person engages in sexual intercourse or sexual intrusion with another person and, in so doing: (i) Inflicts serious bodily injury upon anyone; or (ii) Employs a deadly weapon in the commission of the act[.]").

10

intrusion" as those terms are defined in West Virginia Code § 61-8B-1 (2007) and further

instructed:

> Before the defendant, Brian E. Lyon, II, can be convicted of sexual assault in the first degree as charged in this count of the indictment, the State of West Virginia must overcome the presumption that the defendant is innocent and prove to the satisfaction of the jury, beyond a reasonable doubt, each of the following elements for each of these counts of the indictment, they are:
>
> 1. The defendant, Brian E. Lyon, II,
> 2. Being fourteen years old or more,
> 3. Between, on or about the 29th day of September, 2019,
> 4. In Marion County, West Virginia,
> 5. Did engage in sexual intercourse or sexual intrusion,
> 6. With [D.S.],
> 7. And inflicted serious bodily injury to [D.S.],
> 8. And/or employed a firearm in the commission of the act.

Mr. Lyon states that West Virginia Code § 61-8B-2(a) (2019) provides that

"[w]hether or not specifically stated, it is an element of every offense defined in this article

that the sexual act was committed without the consent of the victim." So, he contends that

this Court should find plain error because the jury was not instructed on this essential

element of the crime.[14] The State responds that the trial court effectively instructed the

---

[14] *See* Syl., *State v. Miller*, 184 W. Va. 367, 400 S.E.2d 611 (1990) ("The trial court must instruct the jury on all essential elements of the offenses charged, and the failure of the trial court to instruct the jury on the essential elements deprives the accused of his fundamental right to a fair trial, and constitutes reversible error.").

11

jury on lack of consent by stating that the State had to prove that Mr. Lyon "inflicted serious bodily injury" to D.S. "[a]nd/or employed a firearm in the commission of the act" because those elements relate to forcible compulsion, and West Virginia Code § 61-8B-2 specifies that "[l]ack of consent results from: (1) Forcible compulsion[.]"

Considering the trial court's jury instruction on first-degree sexual assault as a whole, we conclude that it erroneously omitted the lack of consent element as required by West Virginia Code § 61-8B-2(a). We are unpersuaded by the State's argument that any instructional error was negated because the jury was essentially instructed that infliction of serious bodily injury and/or use of a firearm during the commission of a sexual assault equate to the victim's lack of consent. The problem here is that the trial court not only failed to include lack of consent as an element, it also did not adequately instruct on how lack of consent could be shown through forcible compulsion, nor did it include the definition of forcible compulsion. West Virginia Code § 61-8B-1(1) defines forcible compulsion as "[p]hysical force that overcomes such earnest resistance as might reasonably be expected under the circumstances" or "[t]hreat or intimidation, expressed or implied, placing a person in fear of immediate death or bodily injury to himself or herself or another person or in fear that he or she or another person will be kidnapped." While the instructions given to the jury may relate to a fact-specific inquiry wherein forcible compulsion could be found, the instruction as given was an incomplete statement of the law.

12

A jury instruction that improperly omits an element of a crime is an error of constitutional magnitude.  But our analysis does not stop there because of the absence of a proper and timely objection at trial.  We discussed the application of the plain error rule to infirm jury instructions in *State v. Hutchinson*:

> Although this Court may, under Rule 30 of the West Virginia Rules of Criminal Procedure, notice plain error in the giving of an erroneous instruction (in the absence of a proper and timely objection at trial), this Court will not ordinarily recognize plain error under such circumstances, even of constitutional magnitude, where the giving of the erroneous instruction did not substantially impair the truth-finding function of the trial.[15]

In this case, defense counsel was presented with copies of the proposed jury instructions at least three times throughout the course of trial, and each time he affirmatively stated he had no objection.  So, Mr. Lyon waived his right to have the jury instructed differently.  But even if we accept solely for purposes of analysis that defense counsel did not waive the issue and, instead, merely forfeited it,[16] Mr. Lyon cannot establish that he is entitled to relief under plain error because he cannot prove prejudice:

---

[15] Syl. Pt. 2, *State v. Hutchinson,* 174 W. Va. 688, 342 S.E.2d 138 (1986).

[16] *See* Syl. Pt. 6, *State v. Deel*, 237 W. Va. 600, 788 S.E.2d 741 (2016) ("'Under the "plain error" doctrine, "waiver" of error must be distinguished from "forfeiture" of a right. A deviation from a rule of law is error unless there is a waiver.  When there has been a knowing and intentional relinquishment or abandonment of a known right, there is no error and the inquiry as to the effect of a deviation from the rule of law need not be determined. By contrast, mere forfeiture of a right—the failure to make timely assertion of the right—does not extinguish the error.  In such a circumstance, it is necessary to continue the inquiry (continued . . .)

13

Assuming that an error is "plain," the inquiry must proceed to its last step and a determination made as to whether it affects the substantial rights of the defendant. To affect substantial rights means the error was prejudicial. It must have affected the outcome of the proceedings in the circuit court, and the defendant rather than the prosecutor bears the burden of persuasion with respect to prejudice.[17]

In short, Mr. Lyon offers no argument as to how this instructional error prejudiced him. At trial, defense counsel never advanced the theory that D.S. had consensual sexual intercourse with Mr. Lyon. To the contrary, the defense's theory was that she identified the wrong man.[18] Because the evidence at trial relating to the missing element—lack of consent—was overwhelming and uncontroverted, Mr. Lyon cannot establish that the trial court's charge to the jury impaired the truth-finding function of the trial or affected the outcome of the court proceedings.[19]

---

and to determine whether the error is "plain." To be "plain," the error must be "clear" or "obvious."'") (quoting Syl. Pt. 8. *State v. Miller*, 194 W. Va. 3, 459 S.E.2d 114 (1995)).

[17] Syl. Pt. 9, *Miller*, 194 W. Va. 3, 459 S.E.2d 114.

[18] Defense counsel noted that when D.S. identified Mr. Lyon in the police photograph array, she indicated that she was not one hundred percent sure it was him. Defense counsel also emphasized that investigators found toilet tissue at the crime scene that showed DNA from a single male contributor who was not Mr. Moses or Mr. Lyon.

[19] *See, e.g.*, *People v. Kowalski*, 803 N.W.2d 200, 212-13 (Mich. 2011) (holding defendant failed to establish trial court's instructional error affected his substantial rights and noting "[i]f the evidence related to the missing element was overwhelming and uncontested, it cannot be said that the error affected the defendant's substantial rights or otherwise undermined the outcome of the proceedings.") (footnotes omitted).

14

*B. Prosecutorial Misconduct*

Mr. Lyon also challenges his convictions on grounds of prosecutorial misconduct, based on remarks made by the assistant prosecuting attorney during his opening statement and closing argument. Mr. Lyon did not raise any objection to nor did he seek relief from the prosecutor's remarks during trial, but to avoid procedural default he contends these remarks affected the fundamental fairness of the proceedings. The State responds that even if we assume that some of these remarks were improper, Mr. Lyon cannot show that the errors affected his substantial rights or seriously affected the fairness, integrity, or public reputation of the proceedings.

Lawyers customarily receive wide latitude in making their closing arguments and any alleged improper prosecutorial comments must be considered in the context of the facts of the case. In *State v. Sugg*,[20] this Court held that, "[a] judgment of conviction will not be set aside because of improper remarks made by a prosecuting attorney to a jury which do not clearly prejudice the accused or result in manifest injustice."[21] In *Sugg*, we listed four factors that guide our analysis of the issue:

> Four factors are taken into account in determining whether improper prosecutorial comment is so damaging as to require reversal: (1) the degree to which the prosecutor's remarks have a tendency to mislead the jury and to prejudice the accused; (2) whether the remarks were isolated or

---

[20] 193 W. Va. 388, 456 S.E.2d 469 (1995).

[21] *Id*. at Syl. Pt. 5.

15

extensive; (3) absent the remarks, the strength of competent proof introduced to establish the guilt of the accused; and (4) whether the comments were deliberately placed before the jury to divert attention to extraneous matters.[22]

Here, Mr. Lyon argues that the prosecutor made improper remarks when he referred to Mr. Lyon as a "monster" and "evil" many times and told the jury that it had a "duty to complete this" and "close the book on evil[.]"[23] He contends that the prosecutor abandoned his quasi-judicial role and set a tone that was the opposite of fair and impartial. Mr. Lyon also claims that the remarks resulted in manifest injustice because he was dehumanized and equated with evil. For instance, the prosecutor began his closing argument as follows:

> You know, ladies and gentlemen, nobody likes the guy who says, I told you so. But it's my sad and unfortunate duty to stand before you today and say to you that I told you so. I told you that we would prove that evil exists in this world, that monsters exist in this world, and that it exists in the shape and form of this monster seated right before your very eyes. Study it. Look him in the eyes. Take careful note of his face. This is the man who did every horrible thing that you heard about over the last five days from this witness stand. No question.

---

[22] *Id*. at Syl. Pt. 6.

[23] Mr. Lyon urges us to apply strict scrutiny review, contending that the prosecutor wrongfully injected religion into the case when he referred to D.S.'s miraculous recovery, among other things. But the prosecutor's reference to her recovery was not used in a religious context. D.S. testified that after she was shot in the back, she prayed to God to please not let her die. And first responders testified that D.S.'s condition was so dire that they thought she would succumb to her injuries. So, the prosecutor's reference to D.S.'s plea to God and to her survival as a "miracle" was a fair assessment of the evidence.

The prosecutor also stated that, "[w]e know who killed Christopher Moses. There's no question about it, not a single solitary question. First and foremost[,] the monster claimed his kill." He went on to say that "[w]hen the judge gave you instructions, he talked about malice and a mind bent on evil intent regardless of social duty and evil. Right here it is. (Pointing to [Mr. Lyon.]) Right here in the same room with all of us."

The prosecutor's use of the term "evil" is a problem because he used the word to describe Mr. Lyon personally and not Mr. Lyon's actions. But we recognize that the term "evil" is related to the concept of "malice," and malice is a required element of first-degree murder.[24] So, the assertion that Mr. Lyon was "evil" could have been the prosecutor's attempt to convince the jury that Mr. Lyon possessed the necessary intent to commit the crimes of the first-degree murder of Mr. Moses and the attempted first-degree murder of D.S.[25]

We are more concerned by the prosecutor's use of the term "monster" to describe Mr. Lyon. This characterization of Mr. Lyon was improper and unnecessary. Other courts have found the use of the word "monster" to describe a criminal defendant

---

[24] *State v. Hoard*, 248 W. Va. 428, 443, 889 S.E.2d 1, 16 (2023).

[25] This Court has defined "malice" as "every evil design in general, and by that is meant that the fact has been attended by such circumstances as are ordinary symptoms of a wicked, depraved and malignant spirit and carry with them the plain indications of a heart, regardless of social duty and fatally bent upon mischief." *State v. Mullins*, 193 W. Va. 315, 322, 456 S.E.2d 42, 49 (1995).

17

"'wholly inappropriate[.]'"[26] While the prosecutor's use of this word was improper and extensive, those are just some of the factors we consider under *Sugg*. We also consider whether the remarks tended to unfairly mislead the jury or prejudice Mr. Lyon, the strength of the State's evidence that established his guilt, as well as whether the comments were deliberately placed before the jury to divert attention to extraneous matters.

For several reasons, we are persuaded that reversal of the convictions is not required here. First, the judge instructed the jury that opening statements and closing arguments were not evidence to be considered when determining guilt. Second, given the violent and gruesome nature of Mr. Lyon's crime spree, it is unlikely that the prosecutor's comments had an inflammatory effect on the jury beyond that which would likely result from the evidence presented. Among other things, the jury heard that Mr. Lyon shot D.S., twice, and left her to die naked on the bathroom floor knowing that her young daughter was in the nearby bedroom. The State presented more than substantial evidence over the course of the trial to establish Mr. Lyon's guilt and it is clear that, absent these comments, the jury would have found him guilty of these crimes. And third, there is no indication that

---

[26] *Commonwealth v. Bois*, 62 N.E.3d 513, 532 (Mass. 2016) (quoting *Commonwealth v. Rosario*, 721 N.E.2d 903 (1999)).

the prosecutor made these comments to divert attention away from the relevant facts. So, we decline to find that the prosecutor's improper remarks amounted to reversible error.[27]

## C. *Sufficiency of the Evidence*

In his final assignment of error, Mr. Lyon argues that there was insufficient evidence of intent to support three of his convictions. He first claims that there was insufficient evidence of premeditation to support first-degree murder because the State presented no testimony showing what occurred immediately before Mr. Moses's death. Mr. Lyon's second contention is that there was insufficient evidence to show he had the intent to deprive Mr. Moses of his property to support first-degree robbery. And third, Mr. Lyon claims that there was insufficient evidence to show that he entered Mr. Moses's home with the intent to commit a crime to support burglary. The State responds that the jury could infer the necessary intent to sustain the convictions and that Mr. Lyon is mistaken by his apparent belief that subjective intent may only be shown by tangible evidence.

This Court has held that a criminal defendant takes on a heavy burden when bringing a sufficiency of the evidence challenge:

---

[27] *See, e.g.*, *Boise*, 62 N.E.3d at 531 (finding reversal not required considering the strength of the State's evidence even after finding that the prosecutor made improper remarks by telling the jury that, on the "night of August 4th, 2007, a monster came in the night. A monster came into the life of [the victim], and the monster looked like [the defendant].").

A criminal defendant challenging the sufficiency of the evidence to support a conviction takes on a heavy burden. An appellate court must review all the evidence, whether direct or circumstantial, in the light most favorable to the prosecution and must credit all inferences and credibility assessments that the jury might have drawn in favor of the prosecution. The evidence need not be inconsistent with every conclusion save that of guilt so long as the jury can find guilt beyond a reasonable doubt. Credibility determinations are for a jury and not an appellate court. Finally, a jury verdict should be set aside only when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt. To the extent that our prior cases are inconsistent, they are expressly overruled.[28]

It is well established that a criminal defendant's subjective intent may be inferred from the evidence and circumstances surrounding his actions, and "circumstantial evidence and direct evidence are indistinguishable so far as the jury's fact-finding function is concerned[.]"[29] Because a defendant's mental processes are wholly subjective, it is seldom possible for the State to prove them directly.[30] "Rather, the intent with which an act is committed is a mental process and may be inferred from the words and acts of the defendant and from the circumstances surrounding the incident."[31] For instance, in *LaRock*, this Court rejected the defendant's argument that there was insufficient evidence

---

[28] Syl. Pt. 3, *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995).

[29] *Id*. at 669, 461 S.E.2d at 175.

[30] *LaRock*, 196 W. Va. at 305, 470 S.E.2d at 624.

[31] *State v. Gunther*, 716 N.W. 691, 705 (Neb. 2006).

20

of premeditation to support his first-degree murder conviction, noting that, "as a practical matter, premeditation generally can be proved only by circumstantial evidence."[32]

Having reviewed the evidence in the light most favorable to the State, we conclude that there was ample evidence to support the convictions. The jury could have found that Mr. Lyon had the requisite intent to commit the first-degree murder of Mr. Moses, the first-degree robbery of Mr. Moses, as well as burglary, considering his use of a deadly weapon, the character of the attack (he shot Mr. Moses four times), and the circumstances surrounding the crime spree. The jury could reasonably have inferred that Mr. Lyon took advantage of a vulnerable victim and drove an intoxicated Mr. Moses home with the intent to rob him. It also could have reasonably inferred that Mr. Lyon formed the intent to murder Mr. Moses when he was in the home and had an opportunity for some reflection before walking into the garage to shoot him.[33] The jury heard witnesses who provided detailed descriptions of the crime scene. They also saw photographs of the garage where Mr. Moses's body was found, the bathroom where D.S. was shot, as well as photographs taken from surveillance cameras showing Mr. Lyon on the run from authorities. As the State notes, these are not crimes that one commits on a whim without

---

[32] 196 W. Va. at 305, 470 S.E.2d at 624.

[33] *See* Syl. Pt. 5, *Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 ("Although premeditation and deliberation are not measured by any particular period of time, there must be some period between the formation of the intent to kill and the actual killing, which indicates the killing is by prior calculation and design. This means there must be an opportunity for some reflection on the intention to kill after it is formed.").

some deliberation.  Because there was evidence from which the jury could find guilt beyond a reasonable doubt, we have no basis upon which to overturn its decision.

## IV.  CONCLUSION

For the reasons set forth above, we affirm the Circuit Court of Marion County's December 17, 2021, sentencing order.

Affirmed.